IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD GUTHRIE | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 15-1183 |
| | : | |
| OFFICER KEN GUTHRIE | : | |

KEARNEY, J.                                                                                                October 25, 2016

## MEMORANDUM

When responding to a citizen's call for emergency medical help, a police officer must not violate a citizen's Fourth Amendment rights to be free from unlawful seizure or subject to excessive force. When the citizen later sues the officer for unlawful seizure and excessive force in responding to the 9-1-1 call, we evaluate the adduced facts in deciding whether to apply a community caretaking doctrine exception to permit the officer's warrantless seizure of the distressed citizen. We must separately evaluate whether the officer is entitled to qualified immunity. When, as here, we have two or three widely divergent versions of an officer's brief interaction in a private bedroom, we decline to determine whether the community caretaking doctrine exception applies because absent clearly established standards for police officers defined by the United States Supreme Court in the context of assisting innocent persons suffering a medical emergency in their home, the officer is granted qualified immunity on the unlawful seizure claim. Qualified immunity for this excessive force claim is a jury question when, as here, there are over a dozen disputed material facts regarding the brief interaction. In the accompanying Order, we enter summary judgment for the officer on the unreasonable seizure claim but ask our jury to resolve the facts underlying the excessive force claim.

## I. Background

Brenda Guthrie awoke early morning on January 27, 2015, to find her husband Plaintiff Ronald Guthrie making gurgling noises and having difficulty breathing.[1] Mrs. Guthrie called 9-1-1 to request an ambulance for this medical emergency.[2] Before the ambulance arrived, Defendant Police Officer Ken Guthrie[3] of the Sharon City Police Department along with his partner Officer Steven Winans[4] arrived at the Guthrie home. It is undisputed the Sharon Police Department is notified to assist as needed whenever a 9-1-1 medical emergency call is dispatched.[5] Almost all of the remaining facts in this very short interaction are disputed.

*Mrs. Guthrie's version*[6]

When Officers Guthrie and Winans arrived at her home, Mrs. Guthrie did not give them permission to enter, telling them she needed an ambulance and not police.[7] The officers nevertheless entered the home, proceeding upstairs to the bedroom.[8] It is undisputed when the officers entered the bedroom, they observed Mr. Guthrie awake but disoriented.[9] Mr. Guthrie got out of bed and began walking toward the foot of the bed.[10] When Mr. Guthrie reached the corner of the bed, he stopped, and began stumbling backwards.[11] Mrs. Guthrie, fearing her husband would fall back onto a nearby dresser, asked Officer Guthrie to hold her husband's hand so he would not fall.[12] Rather than assisting Mr. Guthrie, Officer Guthrie grabbed Mr. Guthrie's left thumb, threw him face down on the bed, and handcuffed his hands behind his back, keeping him bent over until paramedics arrived.[13] Mr. Guthrie did not exhibit combative or threatening behavior; he and Officer Guthrie faced each other at all times; Mr. Guthrie did not come in contact with Officer Guthrie's gun and never attempted to touch the gun; and, Mr. Guthrie did not flail his arms, clench his fist, or swing at anyone.[14]

2

Paramedics arrived and transported Mr. Guthrie to a local hospital where a CT scan revealed left posterior brain bleeding.[15] Mr. Guthrie also presented with a laceration to his right wrist requiring stiches as a result of the handcuffs.[16] Mr. Guthrie's brain bleed required transfer to another hospital. There, doctors noted Mr. Guthrie "lethargic" with "multiple episodes of nausea and vomiting," and Mr. Guthrie complained of a severe headache, blurred vision and dizziness.[17] Doctors believe Mr. Guthrie developed a seizure disorder, discharging him on January 31, 2015 with medication to prevent further seizure.[18] On February 2, 2015, Mr. Guthrie consulted with an orthopedic surgeon for severe left leg and groin pain.[19] An x-ray revealed a fracture of the left hip necessitating hip replacement surgery.[20]

*Officer Guthrie's version.*

Officers entered the Guthrie home and went into the bedroom in response to the medical emergency.[21] Upon entering the bedroom, the officers observed Mr. Guthrie awake but disoriented, calling out for, and speaking to, his brother (who was not present) and deceased mother.[22]

Mrs. Guthrie asked Officer Guthrie to assist her husband so he would not fall as he began to stumble while walking toward the officers.[23] At this time, Officer Guthrie observed Mr. Guthrie with clenched fists, not making eye contact, shaky, confused and distressed.[24] Officer Guthrie attempted to calm Mr. Guthrie and prevent him from falling, but Mr. Guthrie continued to walk towards the officers.[25] Officer Guthrie, unsure whether Mr. Guthrie had taken medication causing his behavior, believed if Mr. Guthrie moved past the officers he could reach, and fall down, the stairs.[26] Mr. Guthrie tried to get past the officers, but became frustrated, flailed his arms and appeared off-balance.[27] Mr. Guthrie "tensed up," causing Officer Guthrie to fear he might strike the officers.[28] In an effort to control Mr. Guthrie's movements, Officer Guthrie felt

3

Mr. Guthrie either come into contact with, or tug on, his gun.[29] Officer Guthrie, unsure whether contact with his gun was intentional or accidental, struggled with Mr. Guthrie for a few minutes.[30] Officer Guthrie, in an effort to control the situation, attempted a thumb lock on Mr. Guthrie which failed, resulting in handcuffing of Mr. Guthrie.[31] Mr. Guthrie remained handcuffed and bent over the bed until paramedics arrive. Mr. Guthrie did not complain of pain while being restrained, but said "help me" and "I can't breathe."[32]

## II. Analysis

Officer Guthrie seeks summary judgment on Mr. Guthrie's Fourth Amendment unlawful seizure and excessive force claims. Officer Guthrie does not dispute the restraint and handcuffing of Mr. Guthrie constitutes a seizure. He argues the seizure is not unlawful under the "community caretaking doctrine." Alternatively, Officer Guthrie argues he is entitled to qualified immunity on the unlawful seizure claim. On the excessive force claim, Officer Guthrie argues he is entitled to qualified immunity, asserting the force necessary to effect the restraint is reasonable under the circumstances and Mr. Guthrie cannot show his fractured hip resulted from the use of force.

We find Officer Guthrie is entitled to qualified immunity on the unlawful seizure claim but genuine issues of material fact preclude qualified immunity on the excessive force claim.

### A. Officer Guthrie is entitled to qualified immunity on the Fourth Amendment unlawful seizure claim.

We first address Officer Guthrie's argument the admitted seizure of Mr. Guthrie is lawful under the "community caretaking doctrine." Officer Guthrie contends he arrived at the Guthrie home as a first responder to a medical emergency, found Mr. Guthrie delusional and unresponsive to basic commands and instructions, responded to Mrs. Guthrie's request for assistance to protect Mr. Guthrie from falling, and, in the course of this interaction, felt Mr. Guthrie come in contact with Officer Guthrie's service weapon. To protect Mr. Guthrie, Mrs.

4

Guthrie, his partner, and himself, Officer Guthrie restrained Mr. Guthrie with handcuffs. Officer Guthrie argues his restraint falls within community caretaking doctrine exception to the prohibition on warrantless seizures.

In *Cady v. Dombrowski*[33], the United States Supreme Court introduced the community caretaking doctrine in the context of a warrantless search of a vehicle. The Court recognized "[l]ocal police officers, unlike federal officers frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[34] The Court held the search of a vehicle for a missing service revolver did not violate the Fourth Amendment "because the search was undertaken not for a law enforcement purpose but out of 'concern for the safety of the general public who might be endangered if an intruder removed a revolver' from the vehicle."[35]

In *Vargas*, decided only six days before the Guthrie incident, our Court of Appeals "considered the limits of the community caretaking doctrine," examining its earlier decisions and those from other circuit courts.[36] Our Court of Appeals in *Vargas* extended the community caretaking doctrine to seizures of a person outside of a home for non-investigatory purposes and to protect the individual or the community at large.[37] In *Ray v. Twp. of Warren*,[38] decided over four years before *Vargas*, our Court of Appeals held the community caretaking doctrine did not extend to warrantless searches of homes.[39] Neither case addresses whether this doctrine provides an exception to the Fourth Amendment prohibition on warrantless seizures *inside* the home.

Officer Guthrie asks we apply the community caretaking doctrine and enter judgment in his favor on Mr. Guthrie's Fourth Amendment seizure claim. Officer Guthrie concedes it is "not

5

clear" whether *Vargas* "approved of [the community case doctrine] inside a person's home," but asserts because "there is no evidence contradicting [his] belief that [Mr. Guthrie] was attempting to get his service revolver, one must inevitably conclude that [Mr. Guthrie's] seizure was justified under the community caretaking doctrine."[40] This is a difficult question of constitutional law which we need not address today.

We need not reach the issue of whether Officer Guthrie's seizure of Mr. Guthrie is unlawful because qualified immunity attaches to the seizure claim. "Qualified immunity protects government officials from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[41] It applies to give officers "breathing room to make reasonable but mistaken judgment."[42] "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.'"[43]

In considering whether to apply qualified immunity, we engage in a two-pronged inquiry.[44] First, we must decide "whether the facts that a plaintiff has ... shown make out a violation of a constitutional right."[45] Second we determine "whether the right at issue was 'clearly established' at the time of officer's alleged misconduct."[46] We may begin consideration with either prong.[47] But under the doctrine of constitutional avoidance, we should not unnecessarily wade "into such muddy terrain" when faced with uncertain violations of a constitutional right.[48] "Summary judgment based on qualified immunity should be granted when 'the law did not put the officer on notice that his conduct would be clearly unlawful.'"[49]

Last summer, the Supreme Court again directed our analysis on whether a right is "clearly established" must be very narrow:

> We have repeatedly told courts ... not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct

6

is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, ... will apply to the factual situation the officer confronts.[50]

As most recently counseled by our Court of Appeals, we look for "some degree of specificity in the law...before a right is said to be 'clearly established.'"[51] The right claimed by Mr. Guthrie must be "framed in terms specific enough to put 'every reasonable official' on notice of it, and the more specific the precedent, the more likely it is that a right will meet that threshold."[52]

Applying this standard, and viewing the evidence in the light most favorable to Mr. Guthrie as the non-moving party, Officer Guthrie's restraint of Mr. Guthrie in his bedroom did not violate a clearly established right. The Supreme Court has not defined the scope of the citizen's right to be free from seizure when an officer is assisting a citizen suffering a seizure and potentially reaching for the officer's gun.

Our Court of Appeals' decisions in *Ray* and *Vargas* do not address a clearly established right in this context. In *Ray*, our Court of Appeals affirmed the district court's finding of qualified immunity for officers who entered Mr. Ray's home after a call from Mrs. Ray and based on a known history of domestic disturbances when Mrs. Ray could not see her daughter in the estranged father's home during her visit.[53] The Court of Appeals did not apply the community caretaking doctrine to the home, but found the responding officers entitled to qualified immunity given the absence of precedent in this Circuit on warrantless entry into the home based on the community caretaking doctrine. Our Court of Appeals found "[w]hile the police may not have acted ideally in the situation, what is quite clear from the record is that they were trying to do a difficult job in a potentially dangerous situation."[54] Officer Guthrie, as in

*Ray*, had no defining authority as to Mr. Guthrie's clearly established rights when suffering a seizure.

We must "attend to context" and "need to 'consider the state of the existing law at the time of the alleged violation and the circumstances confronting [Officer Guthrie] to determine whether a reasonable state actor could have believed his conduct was lawful.'" [55] As in *Ray*, we cannot say Officer Guthrie acted unreasonably in restraining Mr. Guthrie during a grand mal seizure.

Officer Guthrie is entitled to qualified immunity from the Fourth Amendment seizure claim.

## B. Issues of fact preclude qualified immunity on the excessive force claim.

Officer Guthrie argues qualified immunity requires we dismiss Mr. Guthrie's excessive force claim. We disagree. There is a significant difference between no clearly established right relating to restraining a citizen suffering a grand mal seizure and possibly actions alleged to be excessive force in the course of this restraint.

Qualified immunity in excessive force cases protects actions in the "hazy border between excessive and acceptable force."[56] In *Mullenix*, the Supreme Court held because of the broad protection qualified immunity affords, summary judgment should be granted when no genuine dispute of fact exists. Citizens have a clearly established right to be free from excessive force while restrained.[57] In light of this clearly established right, district courts tend to deny qualified immunity in cases where the reasonableness of the force used is factually disputed.[58]

We face several questions of material fact, including some from Officer Winan's testimony, affecting the reasonableness of Officer Guthrie's conduct as alleged by Mrs. Guthrie. For example, Mrs. Guthrie claims the Officer threw Mr. Guthrie on the bed and bent him over

8

the foot of the bed until the paramedics arrived.[59] Officer Guthrie swears he feared Mr. Guthrie reached for his gun. Faced with a citizen losing control, Officer Guthrie restrained him with handcuffs and possibly bent him over the foot of the bed. We will allow the jury to determine the reasonableness of Officer Guthrie's conduct during the restraint. We cannot find undisputed facts eliminating the hazy border between excessive and acceptable force. We deny Officer Guthrie's motion based on qualified immunity as to Mr. Guthrie's excessive force claim.

## III. Conclusion

We are not aware of a clearly established right for a citizen not to be restrained while suffering a grand mal seizure. We apply qualified immunity to Mr. Guthrie's Fourth Amendment seizure claim. The right to be free from excessive force is a clearly established right. There are genuine issues of material fact concerning the reasonableness of the force used to restrain Mr. Guthrie. In the accompanying Order, we grant the Officer's motion for summary judgment as to Mr. Guthrie's Fourth Amendment unlawful seizure claim but deny his motion on Mr. Guthrie's Fourth Amendment excessive force claim.

---

[1] Defendant's Concise Statement of Facts at ¶ 1 (ECF Doc. No. 31) ("Defendant SMF").

[2] *Id.* at ¶ 2.

[3] Officer Guthrie is not related to Plaintiff Ronald Guthrie.

[4] Defendant SMF at ¶ 4. Officer Winans is not a party in this action.

[5] *Id.* at ¶ 3.

[6] In response to Defendant's SMF, Plaintiff submitted a Responsive Concise Statement of Fact and "Counterstatement of Facts" (ECF Doc. No. 34). Plaintiff's response to the Defendant's SMF is referred to as "Plaintiff SMF." Plaintiff's Counterstatement of Facts is referred to as "Plaintiff's Counterstatement." Mr. Guthrie testified as having no recollection of the events which occurred between him and the officers. Defendant SMF at ¶ 17.

9

[7] Plaintiff SMF at ¶4; Plaintiff Counterstatement at ¶ 1.

[8] Plaintiff SMF at ¶ 5; Plaintiff Counterstatement at ¶ 3.

[9] Defendant SMF at ¶ 5.

[10] Plaintiff Counterstatement at ¶ 7.

[11] *Id.*; Plaintiff SMF at ¶¶ 6-8.

[12] *Id.* at ¶ 9.

[13] *Id.* at ¶¶ 10, 15. At the time of restraint, Mr. Guthrie cried out: "help me"; "I can't breathe"; "you're hurting me"; "get off me"; "it's painful" and words of similar effect. Plaintiff SMF at ¶¶ 15-16.

[14] *Id.* at ¶¶ 11-14; Plaintiff SMF at ¶¶ 8-10, 12, 19, 24.

[15] *Id.* at ¶ 16.

[16] *Id.*

[17] *Id.* at ¶18.

[18] *Id.* at ¶ 19.

[19] *Id.* at ¶¶ 20-21.

[20] *Id.* at ¶ 23.

[21] Defendant SMF at ¶ 2.

[22] *Id.* at ¶ 5.

[23] *Id.* at ¶ 6.

[24] *Id.* at ¶ 7.

[25] *Id.* at ¶ 8.

[26] *Id.* at ¶¶ 8-9.

[27] *Id.* at ¶ 10.

[28] *Id.* at ¶ 11.

[29] *Id.* at ¶ 12.

[30] *Id.* at ¶ 13.

[31] *Id.*

[32] *Id.* at ¶16.

[33] 413 U.S. 433 (1973).

[34] *Id.* at 441.

[35] *Vargas v. City of Phila.*, 783 F.3d 962, 970-71 (3d Cir. 2015) (quoting *Cady*, 413 U.S. at 447).

[36] *Id.* at 971.

[37] *Id.* at 972 (3d Cir. 2015) (emphasis added).

[38] 626 F.3d 170 (3d Cir. 2010).

[39] In *Ray*, the plaintiff's estranged wife went to plaintiff's home to pick up their daughter for court-ordered visitation. The wife saw someone moving around the house but received no answer after ringing the bell. Worried for her daughter's safety, she called the police. The officers arrived and entered the home without a warrant. *Ray*, 626 F.3d at 177.

[40] ECF Doc. No. 30 at pp. 4-5.

[41] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

[42] *Stanton v. Sims*, ___ U.S.___, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013).

[43] *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

[44] *Id.* at 637.

[45] *Id.* at 637 (quoting *Pearson*, 555 U.S. at 232).

[46] *Id.* (citation omitted).

[47] *Id.*

[48] *Zaloga v. Borough of Moosic*, No. 15-2723, 2016 U.S. App. LEXIS 19079, at *9 (3d Cir. July 12, 2016) (citing *Pearson*, 555 U.S. at 241).

[49] *Id.* at *8 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

[50] *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (internal citations and quotations omitted).

[51] *Zaloga*, 2016 U.S. App. LEXIS 19079, at *10.

[52] *Id.* at *11.

[53] *Ray*, 626 F.3d at 172-73.

[54] *Id.* at 178.

[55] *Zaloga*, 2016 U.S. App. LEXIS 19079, at *11–12 (quoting *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010)).

[56] *Mullenix v. Luna.* 136 S. Ct. 305, 312 (2015).

[57] *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004).

[58] *See, e.g., Noble v. City of Camden*, 112 F. Supp. 3d 208, 228 (D.N.J. 2015) (denying qualified immunity on excessive force claim in a factually disputed case where, under plaintiff's version of the facts, the officer beat the restrained, unarmed plaintiff, including after he fell on the ground); *Geist v. Ammary*, 40 F. Supp. 3d 467, 485–86 (E.D. Pa. 2014) (denying qualified immunity on excessive force claim because of unresolved factual disputes as to the reasonableness of the officer's use of a taser); *Jackson v. City of Pittsburgh*, 688 F. Supp. 2d 379, 401 (W.D. Pa. 2010) (denying qualified immunity on excessive force claim in a factually disputed case where, under plaintiff's version of the facts, officers used force against the unarmed plaintiff who did not exert any threats toward the officers); *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 432 (E.D. Pa. 2008) (denying qualified immunity on excessive force claim in a factually disputed case where, under plaintiff's version of the facts, the officer pushed a compliant prisoner to the ground without provocation from her, and knowing the others present posed no threat).

[59] ECF Doc. No. 34, ¶ 16, Declaration of Brenda Guthrie.